Mr. McDonald, we understand that this might be your first appellate argument. That is correct, Your Honor. And if so, at least as one member of the panel, I suspect this is shared by the others. I think you did well. Thank you very much, Your Honor. I really appreciate it. Thank you. You survived. That's important. It didn't faint. Thank you, Judge. I guess we have a very low standard. You did well, Mr. McDonald. You too, Mr. Kohlen. Welcome back for a second day. Thank you very much again, Your Honors. We'll continue with the criminal theme, at least for the earlier part of the morning. The next case, you're going to have to help me with the names, Mr. Sclafani and Ms. Stage. So, Mr. Sclafani, how do you pronounce your client's name? Well, I pronounce it Chukaseli, and he's not here to complain, Your Honor. Okay. Ms. Stage, how about you? I will try to get them right. This is United States v. Chukaseli. It's the easier one. Case number 17-11507. Mr. Sclafani. Yes. Good morning, Your Honors. I'm Thomas Sclafani on behalf of Mr. Chukaseli. The reason why we're here this morning, or one of the reasons why we're here this morning, I think was capsulized by a comment made by the district judge during the course of the trial, and that was when he said, quote, you are all making this much more complicated than it should be. And what Judge Graham was referring to was really the lack of evidentiary support that the government was presenting on its case-in-chief in order to prove its case-in-chief. And that gives rise, really, to three evidentiary matters that I would like to take the opportunity to address before you. As the Court knows, this case is basically involving seven Georgian individuals who were brought into the United States without papers by the two appellants. There was a group of agents who interdicted, and ultimately there was a gap, and then we have an agent who ran certain information to determine, A, their alienage, and, B, that the Attorney General had not given them permission to enter. And so Judge Graham, candidly, was incredibly frustrated. I mean, it just showed directly through the record. And he capsulized that particular issue by saying the following. He said, no one has testified that Person X was taken to the Coast Guard Station and had information elicited which resulted in the creation of a 213, meaning the I-213. That's the gap. That's why it doesn't make sense. And so the first question is whether the agent, Marla, should have been permitted to testify about accessing a database which indicated that the seven aliens whom he never met, he was able to testify at trial. So that's the first thing. The second issue that it raises is the issue of the admission of the redacted I-13 to begin with. Before you get to the 213 form, with regard to his testimony, is your objection that he could not have testified at all about the lack of a government record during a search of a database or that he couldn't have tried to pin or link that lack of record to the seven individuals who were taken off the two boats? It would be the second, that he couldn't link it. Candidly, with respect to the first issue about his ability to testify from the database, there should have been some testimony as to what that, how that database was created so that at least there would have eliminated any confrontation issue. So really, there should have been. But more importantly, I think, and more poignant in this case, is the fact that there was no connection. And that is the reason why he could not have testified. The second- Tell me about Special Agent Miller and what he testified in his attempt to connect up who was on the boats and who appears in the records of the I-2000. Yes. I believe he was the fellow who took the photographs and also was logging in the belongings and the monies that were there. Once again, Agent Miller was a person who was at the Border Patrol Station and there was no connection between the agents who brought- in other words, the agents who did the interdiction, Your Honor, should have brought these seven individuals to the person, in this case, Agent Miller or Agent Marlis, as you would have it, and say, these are the people who we've just arrested, okay? These are their identities or these are the papers that we've had. And this way, we have essentially a chain of custody. There's an unbroken chain so that when Miller does what he does and when Marlis does what he does, he's doing them for the same seven people who were on the boat. What we have here is an absence of that evidence and what we're relying on now is what Miller was told by somebody, which of course is a hearsay statement that is without exception. So that is the distinction. Now, with respect to the I-213, I understand that the counsel- I just want to go back to Agent Miller for a second. Yes, sir. I thought that his testimony was that the seven people taken off the boats were the ones for whom he did I-213s. That was his testimony, but that was not what- in other words, what he told- it's a question of what did Marlis know? What was he told and under what circumstances? And he had no independent knowledge that the seven people who the interdicting agents stopped and brought in were the same people for whom he now had I-213s and was now running those I-213s. Marlis was told that the passengers who came to the station had been apprehended at sea, right? There was that testimony. Well, but that would be hearsay for Marlis. Was there an objection to that testimony? There was an objection to that, I believe. Yes, Your Honor. Now, was there an objection to Miller's testimony? I do not believe that there was an objection to his testimony, no. Okay. And then, whoops, we're down to 30 seconds. That's okay. It's an important case with important issues. So, tell us about the 213 and why you think the admission is wrong and particularly under a plain error standard given that in at least one case we've said that that sort of a form is generally admissible. Well, and I think that is what the problem is, if I may, Your Honor. And of course, you're referring to the Caraballo case. What the Supreme Court has said in Davis versus Washington is that the court must take a look at the process by which the information is gathered, not the form on which the information ultimately results. So, what the court needs to do is to make a determination about whether the circumstances of the facts, the information that is coming out, was something which was to handle a present emergency, in which case it becomes subject to a hearsay exception, or whether it is a confrontational situation where agents are investigating a past crime, which is what happened here. The problem with Caraballo is, and the distinction, and I'm not saying that the court is supposed to be overruling another panel decision. That's not what I'm asking you to do. What I'm asking you to do is to distinguish Caraballo. Because in Caraballo and some of the other cases in this circuit that deal with the I-213 issue, there was substantial testimony in the trial that the purpose of constructing the I-213 was for routine gathering of information to determine immigration status. Not so in this case. In this case, every single agent who testified, testified that the purpose for them to do what they were doing and ultimately to gather the information they were gathering was because they were investigating a criminal activity specifically. Wouldn't they have had to do that even if they weren't investigating a criminal activity? You've got seven people who show up, not show up, but are apprehended on a vessel coming from the Bahamas with little or no identification and certainly no papers. Isn't any immigration official going to create that sort of a form? I'm not suggesting that. If they had swam to shore and they had run into an immigration official, that official or one of his or her colleagues would have created these forms, right? But the Davis case says that the primary purpose, if the primary purpose of gathering the information was to build a criminal case, then it becomes testimonial hearsay. And that is what we have here. But aren't they just collecting exactly the same information that in an administrative process would be gathered by other immigration officials? But this wasn't an administrative process, Your Honor. Doesn't the government always, when somebody comes to the United States where there is no expedited process for them to come in without documents, that they create an I-213 on them? They gather biographical information to determine what the alienage is of that person, which appears on an I-213. What I'm suggesting to the court is that it would be inappropriate under Davis for a court to take a position that all I-213s are non-testimonial, or in other words, they are matters that are taken in the routine, in the normal course of business. The court needs to look at the circumstances, which in this case are unusual and much different than they have been in Caraballo and other cases where there was testimony about, yes, we gathered the biographical information for the express purpose of simply routinely gathering because we normally do it anyway. There was no testimony below in this case. As a matter of fact, it was to the contrary. We were conducting an investigation to determine whether they were smuggling drugs, whether they were terrorists, or whether they were illegally smuggling individuals into the country. Every agent testified. Caraballo focused on the nature of the information that was collected and allowed those to be admitted in that criminal case by saying, all this is at its core is biographical information similar to the same biographical information that we obtain from everybody. Except that the two elements of the biographical information that are collected are two of the essential elements that needed to be proven for the government to convict these individuals. Number one, where they were from, and I'm looking at the form, and more importantly... So would it have been okay if they went across the street where there was a Border Patrol person and said, I want you to come over and get the information necessary to create this form. We're not going to tell you what we're doing with these people, but just get the information. And he does that, and it's exactly the same information that was collected by the investigators. You would say that would be okay because he didn't have an investigative purpose? No, I would say that was a subterfuge in order to do an end run around Davis. Your Honor, I guess I'm way out of time. You've saved your time for rebuttal, Mr. Scolafani, and obviously you've preserved every other argument you've made in your briefs. Thank you. We'll see you soon. Ms. Stage. Thank you, Your Honor. On behalf of Mr. Skittish Vealy. Skittish, like Skittish Vealy. Makes it easier to understand. May it please the Court. I want to expand a little bit on Mr. Scolafani's presentation in that the government promised when the district court judge said we're missing a witness here, we're missing person X, they can talk about the seven people being dropped off at the border patrol station because that was never tied up. And the government promised that in Agent Miller that was going to happen. But, in fact, Agent Miller, he didn't even fill out the 213s. Agent Miller testified that he did two things. He took pictures, not the same pictures that ended up being on the 213s. He just said, yes, that is a picture of a person I took a picture of. When did he do that, Ms. Stage? When did he say he did that? He did it on the night of August 20th. Bless you, Your Honor. He did it on the night of August 20th. So the day after? No. Day of? In the morning. They were apprehended, I believe, around 8 a.m. in the morning. The boats were stopped. This was that night then? This is that night. Okay. Another important fact is that there was absolutely no testimony whatsoever that anybody, during the time of the interdiction, spoke with any of the people on Mr. Skidishveili's boat. There was no testament. Nobody looked at their paperwork. Nobody got a name. Nobody wrote down a physical description. Absolutely nothing. So you have these four people who nobody knows anything about, and there's no witness that ties bringing those four people to the Border Patrol Station. Wasn't there some testimony? I forget whether this dealt with one boat or both of them. Wasn't there evidence that there were only certain types of documents of any kind found? Agent Haynes, who interdicted Mr. Skidishveili's boat, stated that he did look at the passports of the three individuals that were on that boat, and that is the only testimony that we have as to anybody looking at any paperwork of the seven individuals who were on the two boats. So those individuals all had passports? The three individuals on Mr. Skidishveili's boat did, yes, and they were actually examined by Agent Haynes. Were those introduced into evidence? No, they were not introduced into evidence, Your Honor. Speaking of Agent Haynes, the problem with Agent Haynes and his testimony, he's just simply not credible, and the prosecutor knew that the information that Agent Haynes was testifying to was absolutely not credible, and yet during closing argument, the prosecutor continued to vouch for the veracity of Agent Haynes' testimony that he took $3,500 off of Ciacucelli. Now, the government's case was very weak overall, and the district court judge commented numerous times during this trial how he wasn't happy with how the case was going. He didn't think that it was being tried very well by anybody, frankly, but the prosecutor in closing needed to tie up the fact that these guys were smugglers, and evidence of smuggling can be evidence of payment, being paid to smuggle, and the prosecutor argued that the $3,500 that Agent Haynes claimed he found on Defendant Ciacucelli was, in fact, evidence of smuggling, when at the very same time, the prosecutor knew very well that there was an existing property receipt filled out by Agent Miller which showed that not only the $3,500 in American dollars belonged to one of the passengers, but also the 50 lari, I'm not sure I'm pronouncing that properly, but the Georgian money also belonged to somebody else. I'm assuming the district court, in his instructions, said the argument of counsel is not evidence. It's up to you to determine what the evidence is in the case. It's true, Your Honor. That is what happened. But in reality, we know that jurors look to the government, to the United States of America, to be sure that justice is, that we have justice in these cases. And when the government deliberately argues evidence that it knows not to be true. Well, let's talk about that for a second. My reading of the briefs and the post-trial motions indicates that there was a claim by one of the passengers to the money, but no determination about ownership. Is that accurate? The testimony was that six of the seven people claimed the more than $17,000 that was ultimately collected by Agent Miller. $17,000, there was a claim by one passenger to that, was there not? Yes, there was. There was a claim, but it wasn't adjudicated in any way. Well, not at the time of trial, but we all know now that the government sent this gentleman a form and said, if you want your money, you better claim it. And also, Your Honors. Well, but if you have that sort of – it seems to me that that's an ambiguous terrain because people make claims that are sometimes legitimate and sometimes not and sometimes somewhere in between. And if you have an agent who is changing his story, as Agent Hames did several times, how are you supposed to figure out which one of those versions is accurate? I think one of the most telling ways we can find, we can determine that, Your Honor, is that if this was evidence of payment and if it was actually found on the defendant, it would have been seized, it would have been brought to court, it would have been trotted before the jury as evidence of payment. You said this case wasn't tried very well by anybody. It might not have been investigated very well either, and that happens from time to time. I had a case as a prosecutor where DEA agents mixed up all the identification, money, paraphernalia, everything from four or five individuals allegedly caught together in a drug scheme. And you had no idea what belonged to whom, no property receipts, no inventory, nothing. We don't have that here. We have property receipts here. We have a person claiming the money. We have the government not seizing the money and bringing it to trial, and we even have Judge Graham finding that the government didn't even meet its burden of a preponderance of an evidence as sentencing that these defendants were in fact paid for smuggling. My time is up. We rely upon the arguments in our brief. We've adopted the arguments made by Mr. Chokwasele. Thank you. All right. Thank you very much, Ms. Tate. You've saved your time for rebuttal. Ms. Mariani. Good morning, Your Honors. May it please the Court, Assistant United States Attorney Nicole Mariani on behalf of the United States. Joining me at Council table is Special Assistant United States Attorney Emily Rose, who handled this case before the District Court. I'm going to start. Well, first, one thing that's going to make this case, unfortunately, a little bit more linguistically complicated. The first defendant's last name is actually pronounced Chokwasele, which makes no phonetic sense, but it's Chokwasele. I'm going to just begin where Appellant Chokwasele's counsel left off. I wanted to start, and I think as Judge Duffy alluded to, there was ample circumstantial evidence, which is just as important as direct evidence, demonstrating that those I-213 forms belonged to the passengers on the defendant's two boats. First, Agent Haynes and Mendez, who stopped the defendant's boats at sea, testified that they found seven aliens on those boats and had transferred them to Coast Guard custody on August 20th, 2016. Also on August 20th, 2016, Agent Marlette, who is a supervisory CBP agent at the Dania Beach Border Patrol Station, said that he had received notification that a group of aliens, Georgian aliens who had been apprehended at sea, were being brought to the Dania Beach Border Patrol Station. On August 20th, 2016, Agent Miller was at the Dania Beach Border Patrol Station. He testified that while he was there, a group of seven Georgian aliens were brought to that Border Patrol Station. He took photographs of those aliens. Those photographs that he took matched the photographs on the seven I-213 forms. Agent Miller... Who took those photographs? I do not know. It's not in the record who took the photographs that appeared on the I-213 forms. Agent Miller testified that he took his own set of photographs when they arrived and that his photographs matched those photographs that were on the processed forms. Agent Miller also testified that he looked at the property that came in with that group of seven aliens. Included within that property was Schwozeli's wallet that had Schwozeli's identification in it and Skidishvili's identification, which further indicated that those aliens had come from the defendant's boats. Also, all seven of the I-213 forms state that the aliens were apprehended at 9 a.m. approximately on August 20, 2016 on boats off the coast of Miami. That is exactly when and where multiple agents testified that the defendant's boats were stopped and the aliens were removed from those boats. Also, within that set of the I-213 forms, there's a form for Matishvili, which is who the appellants contend actually owned that $3,500 that Agent Haynes testified he found on Schwozeli, and there's a form for George Sakishvili, who testified in Skidishvili's defense. I think all of that taken together certainly establishes that these I-213 forms belonged to the defendant. What was the second aspect of that with regard to the defense witness? Within this group of seven I-213 forms is a form for George Sakishvili, who testified... One of the aliens. One of the aliens. He testified at trial in Skidishvili's defense and said, I was on Skidishvili's boat. I think all of that together certainly establishes that these I-213 forms belonged to the aliens in question. I also think the district court did not plainly err in admitting the I-213 forms. As your honors pointed out, this court was clear in United States v. Caraballo that I-213 forms are non-testimonial statements that also fall within the rule 8038 hearsay exception for regularly kept public records. In addition, Agent Marlette provided sufficient foundational testimony to admit these I-213 forms. And this is that... Is there something to the defense argument that you have to look at purpose to some degree? Oh, I think it's correct that yes. Under Davis, the primary purpose has to be non-testimonial. And I think what sort of is getting glossed over here is that, and it's at docket entry 136 at pages 25 through 30, Agent Marlette provides foundational testimony for these I-213 forms. He testifies that Customs and Border Patrol agents normally gather the information on those forms from all aliens that arrive at a Border Patrol station. He testified that the form was based on biographical information that the alien provided and any identifying documents that the alien presented and that the primary purpose of the information recorded on the form was to identify and determine the deportability of the aliens. Indeed, in the Caraballo case, it got into... In Caraballo, it was a very similar case where you had alien smuggling, who they came in, the defendants had been apprehended and there was a criminal investigation into the defendants at the time that those I-213 forms were processed. But they remain non-testimonial because even if a secondary purpose was to use them in a criminal prosecution, the primary purpose remained that they were a regular and mechanically-kept immigration record that is completed for any foreign entrant who could be subject to deportability in the United States. In addition, Appellate Skidoshvili's counsel brought up the prosecutorial misconduct argument. The district court did not plainly err, and again, we're on a plain error standard with that claim. In finding that prosecutorial misconduct or in failing to find that prosecutorial misconduct arose from a single statement made by the prosecutor in closing that referenced Agent Haines' testimony that he found $3,500 in Shwesale's wallet. First, the prosecutor did not make a false statement. While the defendants attacked the credibility of Agent Haines... How many times did he change his story? He changed his story a few times, but what he changed his story about was not about whether or not he found $3,500 on Shwesale. He consistently testified on direct, cross, and redirect. He found $3,500. What the inconsistent testimony was about was what the wallet specifically looked like. He could not remember the specific attributes of the wallet. He got confused... Didn't that matter? We'll get to the comments afterward. Didn't that matter because part of the initial testimony was that the money would have been able to fit within the wallet that he first identified as the one that he took, and then when he was shown a different photo of that or this different wallet, he said, oh, I must have been mistaken or something? I think it can matter, but I think the factual context of what was going on when you read what happens on cross and what happens on redirect and when you go back and you look at the actual exhibit is that the photograph of the wallet is taken while it's on the boat, and when you look at this photograph, it's not quite from the best angle it could have been from, and I think another reasonable interpretation was this photograph was turned around. It doesn't look quite right. He's going back and forth between the photograph and the actual wallet, and he just gets a bit turned around, and then on redirect, he's able to look at everything again and reassess and say, okay, it actually could fit. I was looking at it the wrong way, and at the end of the day, whether it was in the wallet, not in the wallet, he consistently testifies over and over again, I found the $3,500 on him, and that's up for the jury to believe, whether or not they find Agent Hands credible, whether or not they found him discredited. That doesn't render this testimonial, as a matter of fact, false, and again, as Judge Duffy pointed out, any misconduct was remedied by the district court's repeated statements at the beginning and at the end of all the evidence that the statements and arguments made by the attorneys are not evidence and they're not to be considered by the jury, and we presume that the jury follows the instructions that we give them. In addition, there was overwhelming evidence of the defendant's guilt without any consideration of the $3,500 found on Chaboussel. First, there was ample evidence... That wasn't the financial remuneration or benefit. It was not an element of this offense, right? Correct, Your Honor. It's not an element of the offense. The elements of the offense are simply that the defendants encouraged the aliens to come to the United States when they could not lawfully do so. There's no need for them to have been paid. Defendants didn't speak to the sufficiency of the evidence. If Your Honors would like me to go through it, I'm happy to. If not, I can rest on my briefs. You can address the arguments they raised. If you choose to address sufficiency, then it's fair game for them on rebuttal. All right, well then... Your choice. If the court has no further questions, the government will rest on its brief and ask that the convictions of the two defendants be affirmed. Thank you. Well, let me ask you about this, and it's an issue they didn't raise, but I'm interested in it, so I'd like you to comment on it. It may not be problematic given the overall tenor of the evidence presented, but it seems to me the district court and the government got it flat out wrong in trying to restrict cross-examination of the alien who testified on the defense's behalf. What do you think? When you're asking someone, did X ask you this question, or did X tell you why, and you know that whatever he told them is not true, it can't be for the truth of the matter asserted. I think, Your Honor, this statement was for the truth of the defense asserted, which is that Skid... Oh, sorry, yes. Skidish-Vealy knew and cared that the aliens had proper documentation before he would bring them. No, but it's not... The truth of the matter asserted doesn't go to the theory of a litigant's case. It goes to the truth of the statement that's being elicited at trial. Well, this Court has not opined on that. The Ninth Circuit has, and the Ninth Circuit in the United States v. Torres case found that a statement was an admissible hearsay when it went to the truth of the defense asserted. And in that case, what had occurred was that... The government asks witnesses all the time whether someone made a statement or didn't make a statement. You want to throw all of that into doubt now? So that when you're asking something that someone said or didn't say that helps your case, now that's all going to be in hearsay land, and you're going to have objections sustained left and right if we write an opinion saying that? I think I'll make one more point, and then I'm going to move on to why I think in any event the decision not to admit this statement was harmless. I think you're right on the second point, but you vigorously argued the first point in your brief, and so I want to test the limits of that. Okay, sure. I think... No, you can stop if you don't want to go further. I just want to make sure you know the road you're heading down. Yes. That if your contention is that merely asking a witness whether someone else asked them something or told them something that you know is not true is for the truth of the matter asserted, you're going to be rewriting a lot of hearsay law, at least in my opinion. Because that statement, that question, cannot be for the truth of the matter asserted. It's being asked to see if the statement was made or not made irregardless of whether the statement is true or not. Irregardless of whether the alien's answer was true or not? That doesn't matter. Because he's not asked about the answer. He's asked about the question. That's the difference. It's different if you're asking the alien to give the answer he gave. That's different. But if you're asking about the question the alien was asked, it seems to me that that's a very different posture. The question here was, do you, the alien, Mr. S., tell? The first question was, did you tell Mr. Cikicvili whether or not you had papers to get them to the U.S.? Why is that hearsay? I think why it's hearsay and it's looking sort of if we wanted to follow the Ninth Circuit or not is that the way this is being presented in the theory of the defense is his whole defense was, I didn't act in reckless disregard because I asked this question. This question shows I was checking. I think it's effectively the same as if Skidishvili's counsel asked Sakiashvili to testify whether Skidishvili had said to him, you need authorization to enter the United States and I'm not going to bring you if you don't have it. He was offering it for that. That's what makes this, I think, a little bit tricky and differentiates it from sort of the entire body of law that Your Honor is talking about. That's why this is this unique circumstance that I think is analogous to the Torres case in the Ninth Circuit. But regardless of this, as Your Honor pointed out, this is harmless. Sakiashvili was able to effectively testify to substantially all of that testimony. The alien who testified on the defense's behalf explained that he had never told either of the defendants that he did not have papers, and he was never going to tell them that. Right, and that they never asked to see them and he had not shown it to them, and that they believed him, which was really sort of what the defense was there trying to elicit. And again, there also was overwhelming evidence supporting the reckless disregard. Even if all of the aliens had testified that the defendants had asked them for papers and they all said that they had lied and said they didn't, there was still so much evidence that these defendants acted in reckless disregard. I mean, you have just extremely suspicious behavior by these aliens. According to the defendant's story and Sakiashvili's testimony, you have seven Georgian aliens on a remote Bahamian island in a group. They are roaming around a marina, looking for anyone to bring them by boat to the United States instead of taking the readily available commercial flights and ferry service between Bimini and South Florida. They have no belongings. Only one of them speaks English. They meet the defendants. They say, you know what? You know how we're going to get to the United States? We're going to go on two 24-foot open single-engine boats with no navigational equipment and no lights being driven by complete strangers at dawn for two hours. That's just not the behavior of someone who's lawfully trying to come to this country. And in addition, the defendants showed their knowledge by attempting to cover up their crime. When they were apprehended, they both separately lied to Customs and Border Patrol agents saying that they had come from Miami when they'd actually come from the Bahamas, and they make no mention that they picked up their passengers from the Bahamas. Skiddishvili throws a black object overboard before he stops his boat. And they also used the hiding in plain sight alien smuggling technique. Where they go at dawn, if you look at Government Exhibit 3, the aliens are wearing sundresses, fedoras, sunglasses. They have no belongings. Trying to just make it look like they're vacationers out for a joyride and not arriving in from international waters. If Your Honors have no further questions, the government will rest on its brief and ask that the convictions be affirmed. Thank you. Thank you very much, Ms. Mariani. If Your Honor please, I'd like to bequeath one of my two minutes to my co-counsel. Sure. Thank you, Your Honor. I believe that Judge, the order entered on the rule 29 motion by Judge Graham speaks volumes, and I'm quoting. Further, Agent Miller, and I interject, he had nothing to do with the interdiction of the passengers, stated that seven Georgian aliens were present at the U.S. CBP station. The I-213 forms were admitted into evidence. Agent Marlett testified that he ran the names of Georgian aliens documented in the admitted I-213 forms, and no records existed showing they had permission to legally enter the United States. Based on this evidence, it was reasonable for the jury to infer the seven Georgian passengers were the same Georgian aliens at the U.S. CBP station with no legal status to enter the United States. As such, there was sufficient evidence that the seven boat passengers were aliens. Most respectfully, I think the gaps between those sentences are the reason why this court should reverse this case. I would also make it clear that I'm adopting, of course, all arguments made in writing and orally by my co-counsel. Thank you, Your Honors. Thank you very much, Mr. Sclafani. Thank you. To touch on a few things that the government stated, number one in regards to Agent Haynes' testimony, it wasn't just a little equivocal. During cross-examination, when he took back his testimony that they were the same wallets, the district court judge tried to clarify what his new testimony was, and he said, you're saying that they're now two different wallets, and the agent says, absolutely. I mean, he was very, very certain about that. So while it's true that the defendants weren't charged under the statute where remuneration would be an element, they certainly believed that their evidence was so weak that they had to bring in some sort of proof that we had smuggling here. Also, a witness testified, one of the other agents that got onto Mr. Sclafani's client's boat, now I don't know how to pronounce his name at all, testified that he never saw Agent Haynes take any money or photograph any money, and he never saw any money at all on the boat or taken from the particular individual. And finally, Agent Miller said that when he was inventorying property receipts and making out property receipts, there was absolutely no money found or claimed by either of the defendants, and there was only six of the people who were at the station. Also, this is kind of a darned-if-you-do and darned-if-you-don't case. The government, if the lights were out on these boats and it was at night and everyone was dressed in black and maybe people laying down, that would certainly be evidence of smuggling. But when the opposite is true... Like the old drug courier profile. Yes, when the opposite is true and they're out on a beautiful sunny day and they're waving at the Coast Guard plane or the Border Patrol plane above and they don't try to outrun them and they cooperate fully, that's evidence of hiding in plain sight and that's evidence of guilt. And finally... But here you also have the added fact that they didn't have the appropriate documents, and that sort of lends an air of truth to the theory, at least in this particular case. That's true, but during closing, one of the examples given by one of the defense attorneys was coincidences do happen, and I would argue that, in fact, they do. And one of the other arguments the government typically makes is that there are two inconsistent stories and, therefore, something's up. Well, here you had two perfectly consistent stories and something's up. So we respectfully rely upon the arguments in our brief. We ask you to please vacate the sentence and the conviction, and I would, again, adopt all of the arguments made by my co-counsel. Thank you all. Thank you very much, Ms. Stage. Mr. Sclofani, we know that you were court-appointed, and on behalf of the panel and myself, we really thank you for your service. It's very important not only to your client but to the system as a whole, and we certainly are thankful for it. Thank you.